

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-3-2005

# Winters v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1854

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Winters v. Comm Social Security" (2005). *2005 Decisions.* Paper 262.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/262

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-1854

ARLENE WINTERS,
                              Appellant

v.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No.: 03-CV-1819
District Judge: The Honorable Terrence F. McVerry

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 20, 2005

Before: SMITH, BECKER, and NYGAARD, *Circuit Judges*

(Filed: November 3, 2005 )

_____

OPINION

_____

SMITH, *Circuit Judge*.

Arlene Winters appeals from the District Court's judgment, which affirmed the

decision of the Commissioner of Social Security denying her application for disability

insurance benefits under Title II and supplemental security income ("SSI") under Title

XVI of the Social Security Act.[1] Our review "is identical to that of the District Court, namely to determine whether there is substantial evidence to support the Commissioner's decision." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). For the reasons that follow, we will reverse the judgment of the District Court.

Winters applied for disability insurance benefits and SSI in June of 2002. She alleged disability on the basis of severe depression, panic and anxiety attacks, and agoraphobia. These psychiatric disorders were diagnosed by Dr. Brenda Freeman in June of 2001 after Winters was involuntarily admitted to Mercy Providence Hospital for treatment. At that time, Winters's ability to function was severely compromised as her GAF was assessed at 25.[2] She responded to treatment with medications and therapy. At the time of her discharge eight days later, Winters's GAF had improved to 45, which

---

[1] The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 405(g). Appellate jurisdiction exists under 28 U.S.C. § 1291.

[2] GAF is an acronym which refers to an individual's score on the Global Assessment of Functioning Scale. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. Text Revision 2000) (hereinafter referred to as *DSM-IV-TR*). The scale is used to report the "clinician's judgment of the individual's overall level of functioning" in light of his psychological, social, and occupational limitations. *Id.* The GAF ratings range from 1 to 100. A score of 25 means that the individual is experiencing a "serious impairment in communication or judgment . . . or [an] inability to function in almost all areas. . . ." *Id.* at 34.

indicated that she continued to experience "serious symptoms . . . or any serious impairment in social, occupational, or school functioning. . . ." *DSM-IV-TR* at 34.

Dr. Freeman continued to treat Winters after her discharge. A progress note dated May 3, 2002, indicated that Winters continued to experience a depressed mood, suicidal plans, and anxiety with panic attacks. Her GAF remained low at 40, indicating that she had "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. . . ." *Id.*

A month later, Dr. Freeman completed a Pennsylvania Department of Public Welfare form. Dr. Freeman confirmed that Winters's diagnoses were "major depression, recurrent, severe without psychosis," and she explained that Winters was unable to work in any capacity without medication because of her depressive symptoms, anxiety, and a fear of leaving her house. Winters's medication included Effexor and Trazadone, two antidepressants, and Cogentin, an antiparkinsonnian drug. Dr. Freeman checked the box on the form which indicated that Winters was "permanently disabled" by a physical or mental condition which precluded any gainful employment and that she was a candidate for disability insurance benefits or SSI.

In October of 2002, Winters was evaluated by Steven Pacella, a psychologist. He documented her past psychiatric history and noted that she was maintained on Effexor, Trazadone, and Cogentin, as well as Zoloft, another antidepressant. Winters advised Dr.

Pacella that she did not consider herself capable of working because she "still can't go places." Pacella's mental assessment indicated that Winters was alert, fully oriented, appropriately responsive, non-delusional, and clear in her thinking with adequate recall. He opined that she was able to understand and follow instructions, had the ability to work within a set schedule and attend to a task. He acknowledged that Winters was "poorly tolerant of adult stress, pressure and responsibility and seems to relate to others in an overly-dependant manner."

In March 2003, Dr. Freeman completed yet another form relative to Winters's application for disability insurance and SSI benefits. Dr. Freeman indicated that she saw Winters every eight weeks and that a psychiatric nurse saw her between these visits. In addition, Winters was seeing an individual therapist on an intermittent basis. Her diagnoses were unchanged and her condition was "chronic and only partially responsive to current treatment." Winters's medication regime included Celexa and Trazadone, both of which were antidepressants, and these medications, according to Dr. Freeman, yielded "about 50% reduction of symptoms." Dr. Freeman explained that Winters had been compliant with her treatment, but that trials of the medications Effexor, Zoloft, Wellbutrin, Vistaril, and Prozac either had resulted in severe side effects or a lack of efficacy.

Dr. Freeman further explained that Winters's symptoms affected her ability to work because she had "continued, moderate to marked panic attacks, anxiety, [and]

4

depression." Dr. Freeman opined that Winters was unable to "work in any capacity at this time." Although Dr. Freeman indicated on an accompanying form that Winters could follow rules, use her judgment, and function independently to a degree, Dr. Freeman documented that Winters was limited by her depressed mood, panic attacks, agoraphobia, crying spells, passive death wishes, low self-esteem, anticipatory anxiety, and avoidant behavior, as well as a decreased ability to concentrate. In fact, Winters's GAF remained in the low-to-mid forties, and she continued to experience serious symptoms affecting her ability to function socially and occupationally. *DSM-IV-TR* at 34.

In addition to the forms completed by Dr. Freeman concerning Winters's ability to work, Dr. Freeman submitted a three page psychiatric evaluation update. Dr. Freeman documented that Winters

> reports continued symptoms of depression and anxiety. Her mood remains depressed with passive death wishes and without active suicidal ideations, planned or intent to harm her self. She feels hopeless and helpless with her situation because of these ongoing Panic Disorder symptoms. She has low self-esteem and very limited support network because she has difficulty leaving the house. Her Panic Disorder consists of panic attacks, both precipitated and spontaneous, and she has to plan several days before she can go out of the house and then she needs someone with her. She has anticipatory anxiety and avoidant behaviors and when she does have a panic attack she has severe anxiety, heart palpitations, nausea, feeling a lump in her throat, fearfulness and it takes up to twenty-minutes of slow deep diaphragmatic breathing for the attack to resolve. She reports that during these attacks she cannot speak and is usually unable to focus on anything but her breathing. . . . She also does report symptoms of social phobia and states that it is difficult for her to be around people that she does not know, but she is trying to work on this and she is hopeful that she can begin to attend a Woman's Support Group here at our agency.

5

Dr. Freeman opined that Winters was unable to work in any capacity because of her depression and anxiety. She further opined that "[a]t this point her main goal is to reduce anxiety enough to begin attending further treatment programs at this agency."

Despite Dr. Freeman's thorough evaluation, the Administrative law Judge ("ALJ") accorded minimal weight to Dr. Freeman's opinion, concluding that it was contradicted by other evidence, particularly Dr. Freeman's report that Winters's condition had improved. Although Winters challenged the ALJ's decision, the District Court affirmed the denial of benefits. We will reverse.

It is well-settled that a treating physician's opinion deserves great weight because that opinion

> reflect[s] expert judgment based on a continuing observation of the patient's condition over a prolonged period of time. An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.

*Plummer*, 186 F.3d at 429 (internal quotations marks and citation omitted).

As Winters's treating physician, Dr. Freeman evaluated Winters every eight weeks over the course of two years, carefully titrating her medications and adjusting her therapy. Dr. Freeman acknowledged that Winters had improved after several medication trials, but noted that her current medication regime reduced her symptoms by only 50%. In addition, Winters's agoraphobia continued to hinder her progress as she was reluctant to leave her house, needing several days to plan any excursion. As a result, Dr. Freeman had

6

shifted the focus of Winters's treatment to reducing her anxiety sufficiently so she could begin to leave her home to attend further therapy on site at the agency. Dr. Freeman's March 2003 report explained how Winters's continued symptomology adversely affected her ability to work. Because Dr. Freeman's detailed report was the most recent medical evidence concerning Winters's psychiatric status in the record and was uncontradicted, it should not have been discounted by the ALJ. *Plummer*, 186 F.3d at 429. For that reason, we conclude that the ALJ erred by relying on the vocational expert's testimony concerning Winters's residual functional capacity inasmuch as it was based on Dr. Pacella's earlier report which not only failed to take into account Winters's inability to freely leave her home, but also did not reflect the extent of Winters's symptomology on her current medication regime. *See Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) (instructing that it is error to rely on a vocational expert's testimony if the hypothetical does not accurately portray the individual's physical and mental impairments).

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence. We will reverse the order of the District Court, and will remand for further proceedings consistent with this opinion.